IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Kenneth W. McClish,

    Petitioner,

  vs.

Mike Evans, Warden,

    Respondent.

_____/

No. CIV S-08-1963 MDS

<u>ORDER</u>

Petitioner Kenneth W. McClish, a state prisoner proceeding pro se, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a). Pending before this court are McClish's petition for a writ of habeas corpus, Respondent Mike Evans's answer, Lodged Documents 1-27, the Findings and Recommendations of the magistrate judge, and McClish's objection to those findings. For the reasons discussed below, McClish's petition is DENIED.

**Facts and Prior Proceedings**

On May 17, 2005, McClish was convicted by a Sacramento County Superior Court jury of second degree murder (Cal. Pen. Code § 187(a)), attempted murder (Cal. Pen. Code §§ 664, 187(a)), and being a felon in possession of a firearm (Cal

Pen. Code § 12022(a)(1)).  Lodged Doc. 1.  He was sentenced to a total of 117 years to life in prison under California's "three strikes" law, with individual sentences of 45 years to life for murder, 30 years to life for attempted murder, and 25 years to life for being a felon in possession of a firearm, along with multiple sentencing enhancements for his prior convictions.  Lodged Doc. 1.  McClish is currently serving this sentence in Salinos Valley State Prison.

## A

Following his conviction, McClish filed a direct appeal with the California Court of Appeals, Third Appellate District.  In its decision affirming the judgment, dated October 19, 2006, the Court of Appeal summarized the relevant facts as follows:[1]

> In August 2003, Demarkas [King], his wife Tamica, and their small daughter lived on Sky Parkway in Sacramento County.  Ralph [King] and McClish lived in separate apartments at 5218 Martin Luther King Boulevard in the City of Sacramento, a bit north of Fruitridge Road; McClish lived with his girlfriend Lisa Knestrict and her aunt Betty Patterson, among others.  Ralph's and McClish's building was about 600 feet from a Taco Bell at the corner of Martin Luther King Boulevard and Fruitridge Road; an open field separated the two buildings.
>
> On August 17, 2003, sheriff's deputies came to Demarkas's apartment in response to a call.  Tamica said that Demarkas, who was not there, had been in a fight.  Demarkas did not contact the authorities.  He later told the police, however, that after he heard banging on his front door and opened it, Michael Washington and others burst in and beat him up, then left.
>
> According to Thomas Ogle, Jr., the 17-year-old stepbrother of Tamica, while visiting the King family in the summer of 2003 he saw Ralph buy a black semiautomatic handgun, then later show it to Demarkas.  In a police interview Ogle said the purchase took place the weekend before the charged crimes, but he testified that it might have been around July 4 because he remembered the Kings had had a barbecue.
>
> According to Betty Patterson, on August 19, 2003, she overheard Demarkas and Ralph talking outside Ralph's building.  Demarkas said the police had learned of the assault on him but did nothing.  Ralph said he did not want his family treated like that.
>
> On the morning of August 20, 2003, Patterson overheard Demarkas and

---

[1] Since McClish has not raised a challenge to their accuracy, the factual findings of the Court of Appeal are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

Ralph talk about getting a gun. Ralph told Demarkas: "We have one gat, and we need another one." Demarkas said he knew where to get another one. Ralph said he would not let his family be disrespected, and Demarkas's attackers "didn't know who they were dealing with."

Before August 20, 2003, Patterson heard McClish tell boys in the building that he had a gun; the boys later told Patterson they had seen it. McClish's girlfriend Lisa Knestrict testified that in July 2003 she discovered a black gun under the mattress on McClish's side of the bed and told him to get rid of it; he said he would.[FN3]

> FN3. McClish was arrested on August 26, 2003. He told Knestrict before his arrest that his brother Rick had removed the gun from the apartment, but Knestrict was not sure whether McClish said so before or after the date of the crimes.
>
> Patterson told the police that she saw McClish's brothers remove a gun from under his mattress on August 25. At trial, however, she testified she heard this had happened but did not see it.

At 10:21 p.m. on August 20, 2003, Demarkas called the sheriff's department from work to report that someone was kicking his apartment door while his wife was at home. The department responded to the call at 10:56 p.m., but found no evidence of a crime and left without filing a report.

According to Patterson, McClish told her on the night of August 20 that Demarkas had called and would come over. Demarkas arrived around 11:00 p.m. and asked Patterson if McClish was home. As Patterson sat on a bench outside, she overheard Demarkas tell Ralph that "the guys were at Taco Bell" and "[w]e need to get over there now." Demarkas went upstairs and came back down with McClish, who carried a gray sweatshirt rolled up under his arm.[FN4] Patterson and Jermal Lee, a teenage resident of the building, saw Demarkas or Ralph walking with McClish at the rear of the building.

> FN4. Knestrict fell asleep that night at 9:30 p.m. She heard someone come to the door asking for McClish, who left the bedroom. McClish told her later it was Demarkas who had come to the door.

At around 11:30 p.m., Michael Washington and Allen Qualls were sitting in a primer-gray 1972 Chevrolet Nova in the Taco Bell drive-through at Martin Luther King Boulevard and Fruitridge Road. Qualls was the driver, Washington the passenger.

Taco Bell employees and customers saw a man walk up to the Nova's passenger side, appear to speak, then pull out a black long-barreled gun and fire into the car. A second man was standing in the drive-through lane two cars behind the Nova. After pausing and looking back at him, the shooter fired more shots into the Nova. The two men then hopped over a concrete wall behind the restaurant.

Eyewitnesses subsequently identified the shooter in photo line-ups and in court as Demarkas. They could not identify the second man, but described him as a heavy-set Black man around 5 feet 8 or 9 inches tall; two witnesses said he was wearing light or khaki shorts.[FN5]

3

> FN5.  The police later found khaki shorts and a gray sweatshirt in Mclish's bedroom.  At the time of the crimes, McClish, who stood 5 feet 9 inches tall, weighed 225 pounds.

The Nova pulled into a nearby gas station, where Qualls collapsed.  Taken to University of California at Davis Medical Center, he was declared dead from a gunshot wound to the abdomen.  Washington was operated on for lung damage from a gunshot that struck him in the back and shoulder.

Investigating officers found six spent shells near the drive-through window and a projectile and bullet fragments inside the Nova.  Another projectile was removed from Washington during surgery.  A ballistics expert opined that the shells and projectiles were fired from the same nine-millimeter gun, at least some while the Nova was moving forward.  No weapons or ammunition were found in the Nova.[FN6]

> FN6.  The police found baggies of marijuana in a paper bag in the car and $700 in cash on Washington.  The prosecutor suggested Washington had been planning to sell marijuana at the Taco Bell.

Betty Patterson and Jermal Lee, in separate positions outside their building, heard four or five shots from the direction of the Taco Bell.  Patterson then saw three people climbing over a fence, heading toward the building from the nearby field.  She recognized Ralph and Demarkas; the third, whose face she could not see, was wearing a gray sweatshirt like the one McClish had on when Patterson saw him in his bedroom soon after.

According to Patterson, Ralph took a handgun out of his waistband and unloaded some shells, while saying, "We do this gangsta style."  Ralph then said he was going to have a drink to calm his nerves and headed to his apartment.  In subsequent days he repeated that he would not let anyone disrespect his family.

Lee testified, as he had told an investigator for the district attorney's office, that after hearing shots he saw Ralph and McClish walking from the field toward the building, then saw Ralph unload the gun as he said, "they should not mess with my family."  However, Lee also testified, as he had told McClish's former attorney, that McClish was with him outside the building when the shots were fired, and it was Ralph and Demarkas whom Lee saw coming toward the building.

After the shooting, Demarkas drove to Oakland, then to San Diego.  He crossed the border into Mexico, but was arrested on a murder warrant as he tried to reenter the United States.

In custody, Demarkas was interviewed on videotape on August 28, 2003, by Sheriff's Detective Charles Husted.  Portions of the interview were played for the jury.

During the interview, after claiming ignorance of the crimes, Demarkas admitted he shot Washington (whom he called "Nova Mike") because he was "fed up" with Washington for threatening him and for assaulting him in his home.  He had aimed only at Washington and did not know who else was in the Nova.  He had gotten the nine-millimeter handgun from his father's home after spotting Washington driving past.

> After Demarkas testified, the prosecution played other portions of his interview, which implicated the codefendants. Demarkas told Detective Husted that Ralph was standing at the concrete wall separating the Taco Bell from a day care center when Demarkas shot Washington, and McClish (whom Demarkas called "Uncle Ken") was in the drive-through area at the time. Ralph and McClish were present as Demarkas ran through the field to their building after the shootings; he gave the gun to Ralph en route. Demarkas knew McClish had a sawed-off .22-caliber rifle, bud did not know if he had taken it to the Taco Bell.
>
> The prosecution also played portions of a taped interview of Ralph made on August 23, 2003, the date of his arrest. Ralph claimed he was walking across the field trying to catch up to Demarkas when the shots were fired. But later Ralph admitted he had followed Demarkas to the wall behind the Taco Bell, pulled himself up to look over it, and seen Demarkas standing by the Nova. Ralph saw Demarkas extend his arm toward the Nova, then heard three or four shots.
>
> After the interview, Ralph and Detective Husted went to the field and Ralph pointed out where he had climbed the fence. He also pointed out a water pipe he had stood on at the base of the seven-foot-high concrete wall, allowing him to peer over its top.
>
> . . .
>
> McClish [] did not testify but tried to refute evidence of his involvement. Othello Chase testified that he had given McClish a .22-caliber sawed-off rifle as collateral for a loan, but reclaimed it three or four weeks before the shootings.[FN9] McClish's brother Rodney testified that, contrary to Betty Patterson's account, he did not remove a gun from under McClish's bed on August 25, 2003, and could not have done so because he was in Green Bay, Wisconsin, visiting his children that week; the children's mother corroborated that testimony.[FN10] To rebut Patterson's claim she saw McClish carrying a wrapped-up sweatshirt on the night of the crimes, he played a portion of a taped interview in which she seemed to say she had merely heard others alleging this.
>
>> FN9. Chase also testified, however, that he gave the gun to McClish 45 days before the shooting and McClish had it for about a month and a half.
>>
>> FN10. On cross-examination, the prosecutor played the tape of a jail phone call McClish placed to his mother and Lisa Knestrict on August 26, 2003, in which Knestrict says Rodney is "right here." Rodney claimed "right here" meant in Green Bay on a three-way connection.

Lodged Doc. 5 at 2-8, 12.

B

McClish filed a petition for review in the California Supreme Court on November 21, 2006. Lodged Doc. 6. On February 7, 2007, the Court denied his petition. Lodged Doc. 7.

### C

On September 13, 2007, McClish filed a petition for a writ of habeas corpus in Sacramento Superior Court, which denied his petition on October 26, 2007. Lodged Doc. 9. McClish then filed in the California Court of Appeal, which denied his petition on December 20, 2007. Lodged Doc. 11. On July 9, 2008, the California Supreme Court also denied his petition as procedurally defective. Lodged Doc. 13.

### D

McClish filed his petition in this court on August 21, 2008. Evans contends that McClish has not exhausted his state remedies, because the California Supreme Court did not rule on the merits of his petition.

**Discussion**

I

McClish's petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA instructs:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>
> (A) the applicant has exhausted the remedies available in the courts of the States; or
> (B) (i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). In order to have exhausted his state remedies, McClish must have provided the California Supreme Court with "[a] thorough description of the operative facts" of his claim, so that the court could have "a fair opportunity to apply controlling legal precedent to the facts bearing upon his constitutional claim." *Kelly v. Small*, 315 F.3d 1063, 1069 (9th Cir. 2003).

### A

The California Supreme Court denied McClish's habeas petition in a one-line order citing *In re Swain*, 209 P.2d 793, 796 (Cal. 1949), and *People v. Duvall*, 886

P.2d 1252, 1258 (Cal. 1995).  Both these cites indicate that McClish's petition was denied because his claim did not allege grounds for relief with sufficient particularity.  *See Harris v. Superior Court of Ca.*, 500 F.2d 1124, 1128 (9th Cir. 1974).  Because such a deficiency can be cured in a renewed petition, denial on these grounds indicates that McClish's available state remedies have not been exhausted.  *Id.*  However, the California Supreme Court's mere citation of *In re Swain* does not end this court's inquiry.  Rather, "[i]t is . . . incumbent upon us, in determining whether the federal standard of 'fair presentation' of a claim to the state courts has been met," to independently review McClish's petition for sufficient particularity.  *Kim v. Villalobos*, 799 F.2d 1317, 1320 (9th Cir. 1986).  If McClish's claims are "incapable of being alleged with any greater particularity," then the California Supreme Court's citation of *In re Swain* will not preclude federal review.  *Id.*

B

McClish's petition before the California Supreme Court briefly presented the argument that his trial counsel rendered ineffective assistance of counsel, because although his investigation produced several witnesses who gave statements supporting an alibi defense, "counsel made no attempt to follow up on or otherwise utilize this important exculpatory evidence."  Lodged Doc. 12.  McClish attached six reports by Bill Deasy, counsel's investigator, and three statements from witnesses, two of which were notarized, as exhibits to his petition.

As correctly noted by the Sacramento County Superior Court in its denial of McClish's habeas petition, the petition "does not specify how each individual statement was relevant to [McClish's] defense[, n]or . . . how the failure to investigate further resulted in the withdrawal of a crucial defense."  Lodged Doc. 9.  Rather, the petition "merely argues that the statements provided exculpatory evidence."  *Id*.  McClish's petition also fails to present evidence or even to explicitly assert that the statements he provided could have been presented at his

trial, in the form of witness testimony. Finally, McClish presents no evidence, other than his unsupported assertions, that his counsel failed to follow up on these statements and consider their utility in presenting McClish's defense.

Such "conclusory allegations made without any explanation of the basis for the allegations do not warrant relief." *Duvall* 886 P.2d at 474. Under this court's independent review, the petition was not argued with sufficient particularity to constitute a "fair presentation" before the state courts. Accordingly, McClish's claims have not been exhausted and he is not entitled to relief.[2]

## II

### A

Notwithstanding this court's conclusion that McClish has failed to exhaust his state remedies pursuant to 28 U.S.C. § 2254(b)(1), the court may nevertheless consider the merits of the case. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Padilla v. Terhune*, 309 F.3d 614, 620-21 (9th Cir. 2002); *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999).

Under AEDPA, a federal court has limited power to grant habeas corpus relief. AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[2] McClish has failed to argue, and there is no evidence in the record to indicate, that he is exempt from exhaustion requirements because there is an absence of available state corrective process or circumstances exist that render such process ineffective to protect his rights. *See* 28 U.S.C. § 2254(b)(1).

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision may result in a decision that is "contrary to" established federal law if it "applies a rule that contradicts the governing law set forth in our cases" or "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "[C]learly established Federal law" is defined as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). The state court's decision may be "an unreasonable determination" if "the state court identifies the correct governing legal principle" but applies the principle unreasonably to the prisoner's factual situation. *Williams*, 549 U.S. at 413.

"In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision." *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Adjudications by state intermediate appellate courts and trial courts are entitled to the same AEDPA deference given to the state supreme court. *See Medley v. Runnels*, 506 F.3d 857, 863 (9th Cir. 2007) (en banc) (reviewing trial court decision as last reasoned court decision and applying AEDPA deference).

B

Clearly established federal law entitles a criminal defendant to effective counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). A petitioner may be entitled to habeas relief if he can show both that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

When applying the first prong of deficient performance, the court must look for "reasonableness under prevailing professional norms." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential," avoiding "the distorting effects of hindsight" and evaluating conduct from counsel's perspective at the time. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," placing the burden on the petitioner to show that the challenged action could not be considered sound trial strategy. *Id.* With regards to following up on witness testimony, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. In assessing the reasonableness of an attorney's failure to investigate, "a court must consider . . . whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). When measuring reasonableness, the court must always "appl[y] a heavy measure of deference to counsel's judgments." *Strickland* 466 U.S. at 691.

To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Such prejudice "'may result from the cumulative impact of multiple deficiencies.'" *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).

The *Strickland* standard applies to both trial and appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2002). The Supreme Court has recognized that "'winnowing out weaker arguments on appeal and focusing on' those more likely to

prevail, . . . is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

### C

McClish argues that his trial counsel's failure to use the exculpatory evidence he attached in his petition constitutes ineffective assistance. This evidence included a private investigator's reports on Marcos Wheatly, Richard McClish, Rodney McClish, Lonnie White, Nancy Jones, and Nicolas Martin, as well as written statements from Shante White, Tiarre Warren, and Jermal Lee. In reviewing the merits of this claim, the Sacramento County Superior Court analyzed each piece of evidence, and concluded that none of the statements contained exculpatory evidence; therefore, McClish's counsel did not err in failing to present the evidence at trial. Affording due deference under AEDPA, this court finds that the state courts were not unreasonable in concluding that McClish was not entitled to habeas relief on this basis. Even assuming, without any supporting evidence, that McClish's attorney did fail to conduct further investigation into these witnesses' statements, none of the evidence presented suggests that this failure to investigate would be outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

### 1

The private investigator's report on an interview with Marco Wheatly provides no explanation how Wheatly's statement is relevant. As the Superior Court noted, Wheatly did not testify at trial for the prosecution or any of the named defendants. Lodged Doc. 9. According to the investigator's report, Wheatly did not know McClish and had only seen him for the first time in court. However, the report accredited Wheatly as asserting that "[t]he whole story about McClish is false," without providing any support for the statement. Based on this evidence, and applying the presumption of effective assistance required under *Strickland*, this

court cannot conclude that McClish's attorney acted outside the wide range of reasonableness in failing to follow up with this witness.

2

The investigator's reports on Richard and Rodney McClish, the petitioner's brothers, also do not provoke a finding that counsel was ineffective. The single piece of substantive evidence in Richard's statement was his denial that he ever went to McClish's apartment to retrieve a gun as both Lisa Knestrict and Betty Patterson testified. Again assuming that counsel failed to follow up on this evidence, his failure nonetheless fails to compel a conclusion of ineffective assistance, because it is highly unlikely that this evidence, if presented at trial, would have altered the proceedings. Richard's testimony would probably have been discounted by the jury, because he is McClish's brother. Even if he was believed, however, his testimony would do little to undermine evidence that McClish was present at the time of the shooting and that he had a gun. At most, Richard's testimony would suggest that McClish lied to Knestrict about removing the gun either before or after the shooting, and that Patterson was misinformed on the issue. Richard's testimony would not undermine other portions of the two women's testimony against McClish, nor counter Demarkas King's (Demarkas) implication that McClish was directly involved.

McClish's claim that his counsel rendered ineffective assistance by failing to follow up on the investigator's report for Rodney is also meritless, because his attorney clearly did follow up by calling Rodney to the stand to deny Patterson's report.

3

The investigator's report of his interview with Lonnie White also does not compel a finding of ineffective assistance of counsel. First, White's underlying association with McClish stems from illegal activity: White claimed to know McClish because he had bought marijuana from him in the past. White also claimed

12

to know Ralph King (Ralph) through marijuana purchases. It would be well within the realm of reasonableness for counsel to conclude that calling White as a witness would be detrimental to his client's case, or at the least that White was an undesirable witness who could easily be impeached. Further, White's interview did not present testimony that was particularly exculpatory. He asserts that there were only two persons at the shooting, indicating "[i]f there was a third person he would have seen him," but also acknowledges that he did not observe the entire encounter. Finally, White was incarcerated at the time of the investigator's report, and counsel could well have concluded that the effort it would take to present his impeachable testimony was not worth the limited advantage to his case.

4

The investigator's report on Nancy Jones indicates that the majority, if not all, of her testimony regarding McClish's participation would be inadmissible hearsay. Jones did not witness the shooting, but reported that Ralph had told her that his son had shot the victims at the Taco Bell, and that McClish was not at the shooting and had nothing to do with it. She also indicated that Patterson had told her that McClish was not involved in the shooting. Since it appears Jones had no first-hand knowledge of what happened, it was reasonable for McClish's counsel not to follow up on Jones's report or call her as a witness.

5

The investigator's report on Nicolaus Martin presents a closer issue. Martin told the investigator that McClish was extremely drunk that night, so much that he needed help to get back to his apartment just prior to the shooting. He also indicated that Ralph and Demarkas left the apartment complex alone, contradicting other reports that McClish had gone with them. This evidence might have been exculpatory if supported by evidence that McClish was, in fact, too drunk to leave his apartment, as Martin asserted. However, there is a lack of evidence, such as an affidavit, to show that Martin would have testified consistent with the investigator's

13

report. Martin was also interviewed in the Sacramento County Jail, suggesting that he was also an easily impeachable witness. Hence, this court cannot conclude that the state courts were unreasonable in finding that failure to follow up on Martin's testimony was not ineffective assistance of counsel.

Even if counsel's alleged, unproven, failure to follow up with Martin could be considered ineffective assistance of counsel, McClish has failed to show that this failure prejudiced his case. Martin's testimony conflicted with that of Lisa Knestrict, McClish's live-in girlfriend and a key witness in the case. Knestrict testified that McClish was at home watching a movie before he left the apartment sometime after 9:30 p.m. She did not mention McClish's alleged intoxication. In addition, Martin's testimony conflicts with witnesses at Taco Bell who observed a participant in the shootings who fit McClish's description, but not that of either of his co-defendants. Martin's testimony also conflicts with witnesses who saw McClish with the Kings right after the shooting. In light of the holes in this evidence, McClish has failed to meet his burden to show a reasonable probability that the outcome of his jury trial would have been different, had his counsel made further efforts to follow up on Martin's interview.

6

Shante White's notarized but unsworn, undated statement is, like Jones's statements, entirely hearsay. She reports that a friend told her that McClish went upstairs to sleep the night of the shooting, and that someone else told her he was still asleep at the time of the shots. With no first-hand knowledge of any fact of consequence related to McClish's defense, this court cannot say that McClish's counsel rendered ineffective assistance in failing to follow up on White's statement.

7

Tiarre Warren's statement would corroborate Martin's testimony that McClish got drunk prior to the shootings, but nothing further. This testimony is in no way exculpatory, however, because it indicates that McClish left of his own

accord and does not contradict other reports, including testimony by Knestrict, that McClish got up from his bed to meet with the Kings and then left with them to participate in the shooting. Because Warren's testimony was so weak in terms of relevance, McClish's counsel did not render ineffective assistance by failing to follow up with her.

8

Jermal Lee's statement was exculpatory, in that it placed McClish with Lee at the apartment complex at the time the shots were fired. This statement was contradictory to Lee's trial testimony, but McClish's counsel was able to impeach Lee with it during cross-examination. The statement was used as part of McClish's defense; it is therefore clearly incorrect that counsel "made no attempt to follow up on or otherwise utilize this important exculpatory evidence." Accordingly, there is no evidence that counsel rendered ineffective assistance with regard to this testimony.

D

McClish also claims that his appellate counsel rendered ineffective assistance by not arguing ineffective assistance of counsel and failing to raise the issue of juror misconduct on appeal. Because both of these arguments are without merit, the state court was not unreasonable in denying McClish's habeas petition on these grounds.

As explained above, McClish's claim that his trial counsel rendered ineffective assistance of counsel is without merit. He has provided no proof, only conclusory allegations, that his counsel did fail to follow up with the witnesses and statements presented. In fact, the evidence suggests the opposite, because counsel did question at least two of the witnesses about their statements when they testified, bringing the allegedly exculpatory evidence to the attention of the jury. Even assuming that counsel did not follow up on some of the witness statements, there was no ineffective assistance of counsel because it was within the wide range of

reasonable professional assistance not to waste time and effort following up on statements that were entirely based on hearsay, highly subject to impeachment, or irrelevant. Finally, even if it would have been prudent for McClish's counsel to follow up on some of the witnesses statements, McClish has failed to show that he was prejudiced by the alleged failure to do so. Because McClish's claim of ineffective assistance of counsel at trial was without merit, his appellate counsel did not render ineffective assistance in failing to raise it.

Nor did McClish's appellate counsel render ineffective assistance in failing to raise the issue of juror misconduct on appeal. About a week after the jury verdicts, Demarkas filed a motion for a new trial based on alleged juror misconduct, which McClish later joined. The trial court conducted an extensive hearing on the issue, questioning ten jurors and one alternate juror regarding the allegations. Nine of the jurors flatly denied the allegations, leaving only the alternate juror and Juror No. 4, on whose declaration the defendants had based their motion. Juror No. 4's allegations were further refuted by outside witnesses. The trial court found, after hearing all the evidence, that no misconduct had occurred.

Under California law, a trial court's ruling on a motion for a new trial is reviewed for abuse of discretion. *People v. Guerra*, 129 P.3d 321, 388 (Cal. 2006). "In resolving a question of whether jury misconduct occurred, [the appellate courts] 'accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" *People v. Mendoza*, 6 P.3d 150, 190 (Cal. 2000) (quoting *People v. Nesler*, 941 P.2d 87, 101 (Cal. 1997)). In this case, the record supports both the trial court's credibility determinations and the court's conclusion that no misconduct occurred. Lodged Doc. 21, 22. Given the lack of credible evidence in support of the motion for a new trial on the basis of juror misconduct, and the high standard of review given to the trial judge's determination, the appellate counsel did not act unreasonably in failing to raise this issue on appeal.

**Conclusion**

It is hereby ordered that McClish's application for a writ of habeas corpus is DENIED. The Clerk is directed to enter the judgment and close the case.

DATED: August 21, 2009

/s/ Milan D. Smith, Jr.
UNITED STATES CIRCUIT JUDGE
Sitting by Designation